IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHELLE SCHUR,                                              CV. 08-1455 AA

      Plaintiff,                                        OPINION AND ORDER

          v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

_____

AIKEN, Chief Judge:

      Plaintiff Michelle Schur ("Schur"), brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, the decision of the Commissioner is reversed and this case is remanded for the calculation and payment of benefits.

## PROCEDURAL BACKGROUND

      Plaintiff filed applications for benefits on May 5, 2005 alleging disability since December

29, 1992, due to respiratory problems, a paralyzed diaphragm, obesity, asthma, migraines, and depression. Her applications were denied initially and upon reconsideration. On January 31, 2008, a hearing was held before an Administrative Law Judge ("ALJ").  In a decision dated February 14, 2008, the ALJ found plaintiff was entitled to SSI benefits as of May 5, 2005.  The ALJ found that plaintiff was not disabled prior to May 5, 2005, and therefore was not eligible for DIB benefits because she had not demonstrated disability before June 30, 1997, her date last insured.  On October 14, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Plaintiff now seeks judicial review of the Commissioner's decision.

Plaintiff's previous application for Title II benefits was denied on February 24, 1995. Because plaintiff did not appeal that denial of benefits, she cannot allege that she became disabled before February 24, 1995. *Green v. Heckler,* 803 F.2d 528, 530 (9th Cir 1986). Accordingly, plaintiff had to establish that she became disabled between February 1995 and June 1997.

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala,* 66 F3d 179, 182 (9th Cir. 1995), *cert. denied,* 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan,* 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C.

§ 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## ALJ's DECISION

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset of disability on December 29, 1992. This finding is not in dispute.

At step two, the ALJ found plaintiff had the medically determinable severe impairments of chronic obstructive pulmonary disease ("COPD") and headaches. This finding is in dispute.

At step three, the ALJ found that plaintiff's impairments did not meet or medically equal a listed impairment. This finding is not in dispute.

At step four, the ALJ determined that prior to June 30, 1997, plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except that she could only occasionally climb ramps and stairs, she could not climb ladders, ropes, or scaffolds, and she could not be exposed to gases, dusts, odors, or other respiratory irritants. The ALJ thus found that plaintiff was able to return to her past work as a medical claims representative. This finding is in dispute.

## FACTUAL BACKGROUND

Plaintiff was born in 1953, and was 53 years old at the time of the hearing decision. Tr. 74. She has worked as a medical secretary and medical claims representative. Tr. 81, 89. She completed

high school, two years of community college, and paralegal courses. Tr. 86, 620.

The medical records in this case accurately set out plaintiff's medical history as it relates to her claim for benefits. The court has carefully reviewed the extensive medical record, and the parties are familiar with it. Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

Plaintiff contends that the ALJ erred by: (1) failing to find some of her impairments severe at step two; (2) improperly rejecting the opinion of a treating physician; (3) failing properly to determine the onset date; (4) failing to consider her combination of impairments; (5) finding her not fully credible; and (6) finding she could perform her past relevant work.

I. The ALJ Did Not Err At Step Two

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* § 404.1521(b).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 U.S. at 153-54. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect

on an individual's ability to work." *See* SSR 85-28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone. 20 C.F.R. § 404.1508. The ALJ's development of the RFC and analysis at steps four and five must include consideration of limitations caused by all of a claimant's impairments, both severe and non-severe. 20 C.F.R. § 404.1545(a)(2).

Plaintiff contends that the ALJ erred by failing to find her right hemidiaphragm condition, obesity, and depression to be severe impairments, and failing to include the limitations arising from those impairments in the RFC. Because the ALJ found that plaintiff has severe impairments at step two and continued the analysis there was no error at step two. The issue is whether the ALJ properly considered limitations arising from all of plaintiff's medically documented impairments in determining her RFC.

A. Paralyzed Right Hemidiaphragm

Plaintiff contends that the ALJ failed to account for limitations arising from her hemidiaphragm condition. She cites medical evidence that the condition contributes to the severity of her dypsnea, or difficulty breathing. However, plaintiff does not point to any other limitation arising from her paralyzed right hemidiaphragm. The ALJ found that plaintiff had the severe impairment of COPD prior to June 1997, and that she had shortness of breath that caused her to be winded when cleaning the house or walking the dog. The ALJ adequately considered the limitations arising from the hemidiaphragm condition.

B. Obesity

Plaintiff does not identify any functional limitations arising from obesity other than the

5 - OPINION AND ORDER

shortness of breath acknowledged by the ALJ. The ALJ did not err in finding plaintiff's obesity not severe at step two.

C. Depression

Joseph Siemienczuk, M.D., was plaintiff's treating physician from December 1994 until November 2001. In February 1995 Dr. Siemienczuk noted that plaintiff's counselor recommended antidepressants, and he proscribed Paxil. Tr. 320. On March 29, 1995, Dr. Siemienczuk reported plaintiff "feels she is doing well on Paxil, starting to get a pretty good response," without side effects. Tr. 317. By May 1995, plaintiff reported her depression was "tremendously improved and stable." Tr. 316.

Plaintiff saw Dr. Siemienczuk at least 17 times between June 1995 and May 1996. The records do not include any reference to depression. Tr. 294-313.

On June 10, 1996, plaintiff reported that she had started Serzone three days ago and was "quite depressed, indicating that it was affecting her memory, and she is anticipating hopefully therapeutic benefit from Serzone." Tr. 293. Plaintiff saw Dr. Siemienczuk at least seven times between June and November 1996, but the records do not reflect any discussion of depression. In December 1996, plaintiff was not taking any antidepressant medication, and was "doing pretty well in this regard, except for in the premenstrual week. . . ." Tr. 289.

Dr. Siemienczuk saw plaintiff at least ten times between January 1997 and February 1998 without recording any discussion of depression, except that on June 11, 1997, plaintiff requested weight loss medication, and she suggested that her asthma, depression, and knee pain were co-morbid conditions that should qualify her for coverage of the medication. Tr. 279-288.

In February 1998, plaintiff reported that she was compulsively picking at her scalp. Dr.

Siemienczuk noted that she had been off Serzone for several months. Tr. 278. Questioned as to depression, plaintiff was not sure whether she had depression symptoms, though she had some spontaneous tearfulness. Dr. Siemienczuk stated that "I cannot really tell for certain whether there is an underlying dermatitis or not, and I raised the question of whether this is a manifestation of an obsessive-compulsive component to her depression. She is not certain but is open to trying Serzone again." *Id.*

The ALJ determined that plaintiff did not establish that, prior to June 30, 1997, depression caused more than a minimal effect on her ability to perform basic work duties.

Plaintiff contends that depression did affect her ability to perform work duties, but she does not identify any functional limitations arising out of depression prior to June 1997. Plaintiff points to a mental health assessment completed by Celeste Baskett, MSW, on January 4, 2007, in which she assessed plaintiff with a Global Assessment of Functioning, or GAF[1] score of 60, indicating moderate difficulty in social, occupational, or school functioning. Tr. 435. Plaintiff contends that a November 2007 assessment by Ms. Baskett and J. Ballin, PMHNP, in which they reported that although plaintiff's symptoms are "partially managed by medication," plaintiff "continues to struggle with chronic depression and anxiety," establishes that her depression is longstanding and moderate to severe. Tr. 420.

Neither the January 2007 nor the November 2007 assessment establish that plaintiff had work

---

[1]The Global Assessment of Functioning (GAF) Scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000). It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations. *Id.* at 34.

related limitations arising from depression prior to June 30, 1997.  The ALJ did not err.

II.  The ALJ Erred in Weighing the Opinion of the Treating Physician

John Keppel, M.D., is a pulmonary specialist who has treated plaintiff since September 2000.

Tr. 385, 534.  At plaintiff's initial visit, Dr. Keppel reviewed her medical records, apparently

including an x-ray dated prior to May, 1996, as the record states "(tape gap for three minutes)  The

next x-ray is from 5/7/96."  Tr. 385.  Dr. Keppel also reviewed x-rays dated March 15, 1999, May

23, 1999, and August 10, 2000.  *Id.*

Dr. Keppel's treatment record of June 2005 includes a history of plaintiff's condition.  Tr.

357.  Pulmonary function testing ("PFT") on August 16, 2000 showed a severe reduction in FEV1[2]

to 44 percent of predicted[3].  Tr. 398.  A September 2000 note by Dr. Siemienczuk indicated that

plaintiff's FEV1 was "a bit down" to 1.31 liters.  Tr. 223.  Her April 2003 FEV1 was 30% of

predicted.  Tr. 357.  Plaintiff's FEV1 score in May 2005 was 1.23 liters, or 41% of predicted.  Tr.

358.  Dr. Keppel found total lung capacity of 76% of predicted, with a combined  obstructive and

restrictive impairment, but somewhat improved since 2003.  *Id.*  Dr. Keppel's impression was

"[l]ifelong asthma with some evidence for remodeling and lack of reversibility."  On January 17,

2008, Dr. Keppel opined in a questionnaire that plaintiff could stand and walk about 15 minutes at

---

[2]FEV1 is the Forced Expiratory Volume in the first second.  It is the volume of air that can be forced out in one second after taking a deep breath, and is used as a measure of pulmonary function.

[3] Although there are a number of systems to measure the severity of Chronic Obstructive Pulmonary Disease, the Global initiative for Obstructive Lung Disease ("GOLD") describes:  I. Mild COPD when the FEV1 is greater than 80% of predicted; II.  Moderate COPD when the FEV1 is less than or equal to 80% of predicted and shortness of breath develops upon exertion; III. Severe COPD when the FEV1 is less than or equal to 50% of predicted and exacerbations are common; and IV.  Very Severe COPD when the FEV1 is less than or equal to 30% of predicted, the quality of life is gravely impaired, and exacerbations can be life threatening.

one time, she could sit for about one to two hours, she had severe shortness of breath limiting her activity, and she would be expected to miss more than two days a month from even a sedentary position due to the exacerbation of her asthma. Tr. 534-37. On January 31, 2008, Dr. Keppel completed a form in which he asserted that plaintiff would have been similarly restricted between 1992 and 1997, based on his review of her medical records and the similarity between April 2003 and January 2007 breathing tests. Tr. 543.

The ALJ said that "Dr. Keppel's assessment is given no weight in assessing the claimant's functioning prior to her date last insured. He has been treated [sic] the claimant only since September 2000. Although he opines the claimant has experienced the described limitations prior to 1997, he bases this assessment on test results from April 2003 [citation omitted]." Tr. 26. The ALJ also noted that state agency consultants opined that the plaintiff had no severe impairment prior to her date last insured, citing exhibits 2F and 7F. Exhibit 2F is a Psychiatric Review Technique form prepared by Dorothy Anderson, Ph.D., in which Dr. Anderson concludes that plaintiff had non-severe depression prior to her date last insured. Tr. 128-140. Exhibit 7F is a one paragraph report by Sharon B. Eder, M.D., dated December 16, 2005. Dr. Eder notes that there is medical evidence in the record prior to June 1997, but states that it is "unfortunately not enough to adequately determine function." Tr. 415. Dr. Eder states that most recent PFT's note a 1.54 FEV1. "This is severe, but not listing level . . . . Cl has prior PFTs within listing range, but these are previous to adjudicative period and steadily improve." *Id.*

If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Holohan v. Massanari,* 246 F.3d 1195, 1202 (9th

Cir. 2001); 20 C.F.R. § 404.1527(d)(2). An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. *Id.* at 1202, citing *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998). And the opinion of a specialist concerning matters relating to their specialty are given more weight than the opinion of nonspecialists. *Holohan v. Massanari,* 246 F.3d 1195, 1202 (9th Cir. 2001). An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she provides "specific and legitimate" reasons supported by substantial evidence in the record.

The ALJ did not have clear, convincing, specific or legitimate reasons to discount Dr. Keppel's conclusions. As a psychologist, Dr. Anderson's opinion is not relevant to plaintiff's primary physical limitation of restricted breathing. The opinion of the examining physician, Dr. Eder, is not sufficient to outweigh the opinion of the treating specialist. Accordingly, the ALJ's decision is not supported by substantial evidence. Because this issue is dispositive, the court need not address the other errors alleged by plaintiff.

## CONCLUSION

The findings of the Commissioner are not based upon substantial evidence in the record and the correct legal standards, and therefore the court reverses the decision of the Commissioner and remands this matter for the calculation and payment of benefits.

IT IS SO ORDERED.

Dated this ___ day of January, 2010.

_____
ANN AIKEN
United States District Judge

10  - OPINION AND ORDER